UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DARK HORSE EXPRESS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| Counter-Defendant, | ) | |
| | ) | 3:15 C 01491 |
| v. | ) | Hon. Marvin E. Aspen |
| | ) | |
| LANCER INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant, | ) | |
| Counter-Plaintiff. | ) | |

# MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Dark Horse Express, LLC ("Dark Horse") alleges Defendant Lancer Insurance Company ("Lancer") has in bad faith and in breach of its contractual duties refused to provide insurance coverage for loss suffered to certain cargo Dark Horse was responsible for shipping. Presently before us are the parties' cross-motions for summary judgment. (Dkt. Nos. 37, 46.) Also before us is Lancer's motion for oral argument on its motion for summary judgment. (Dkt. No. 69.) For the reasons stated below, we grant Lancer's motion for summary judgment, deny Dark Horse's motion for partial summary judgment, and deny Lancer's motion for oral argument as moot.

## BACKGROUND

### I. FACTUAL BACKGROUND

Unless otherwise stated, the facts described herein are undisputed and taken from the parties' Local Rule 56.01 submissions. (*See* Pl.'s SOF (Dkt. No. 49); Def.'s SOF (Dkt. No. 37–17).) On May 6, 2014, Dark Horse entered into a carrier transportation agreement ("the agreement") with Peachtree Freight Logistics, LLC, who did so on behalf of Performance

Food Group Customized Distribution and other Performance Food Group Entities ("PFG"). (Def.'s SOF ¶¶ 3–4.) The agreement is the only contract between PFG and Dark Horse, and it covered all dealings between PFG and Dark Horse. (*Id.* ¶ 6.) In September 2014, PFG hired Dark Horse to transport a load of meat from Standard Meat Company in Dallas, Texas to PFG in Lebanon, Tennessee. (*Id.* ¶ 19.) Dark Horse's driver picked up the meat from Standard Meat Company on September 10, 2014. (*Id.* ¶¶ 21, 24.) After picking up the load, the driver stayed the night in a motel and left the loaded tractor-trailer outside. (*Id.* ¶¶ 25, 27.) The driver fell asleep in the motel room and the tractor-trailer was gone when he awoke. (*Id.* ¶¶ 27–28; Green Dep. (Dkt. No. 37–8) at Pg. ID#: 612.)

On September 11, 2014, Dark Horse's owner, Jeff Hickman, checked the GPS tracking device in the tractor-trailer and found that the truck had not left Dallas. (Def.'s SOF ¶ 33.) Hickman called the Dallas Police Department and requested they locate the tractor-trailer and check on the driver. (*Id.* ¶ 35.) The police found the tractor-trailer in the Dallas area with the refrigerated trailer still running and padlocked. (*Id.* ¶ 36.) The police impounded Dark Horse's tractor, but the loaded trailer was sent to one of PFG's warehouses. (*Id.* ¶ 38.) On September 12, 2014, a United States Department of Agriculture ("USDA") employee inspected the trailer and found that the meat products were not contaminated or adulterated, and thus could be released into commerce for consumption. (*Id.* ¶¶ 39–45.) After the USDA inspection, PFG performed an inventory of the load and found that $34,755.88 worth of meat was missing from the trailer. (*Id.* ¶ 51.)

On September 17, 2014, PFG informed Lancer that its customer refused to accept the cargo "due to the loss of control of the load during transportation." (Dkt. No. 45–8.) That same day, Lancer sent PFG a letter acknowledging PFG's cargo claim for over $260,000, and stating

2

that it was handling the claim, subject to a full reservation of rights, on Dark Horse's behalf. (Dkt. No. 45–9.) Lancer then facilitated a salvage sale of the remaining meat to Front Street Commodities Corp. for $53,500, which it paid to PFG. (Def.'s SOF ¶¶ 52–53, 55.) Dark Horse's counsel sent a letter to Lancer that same day demanding it pay PFG's claim for $262,788.42, less the $53,500 received from the sale of the meat. (*Id.* ¶ 57.) Lancer's counsel responded via letter on January 15, 2015, informing Dark Horse that it did not believe PFG's cargo had sustained any loss and that "Lancer has no obligation to pay a cargo claim until the legal liability of Dark Horse is established." (Dkt. No. 37–15 at 2.) Lancer further stated that it would "defend Dark Horse if suit is filed against it related to the cargo claim." (*Id.*) On March 2, 2017, Dark Horse began independently making voluntary payments to PFG. (Pl.'s SOF ¶ 12.) Dark Horse paid PFG at least $156,000. (*Id.*) Lancer never consented to Dark Horse voluntarily paying or settling the cargo claim with PFG. (Def.'s SOF ¶ 64.) To date, Lancer has not formally allowed or denied Dark Horse's cargo claim. (Pl.'s SOF ¶ 24.)

## II. INSURANCE POLICY PROVISIONS

The insurance contract between Lancer and Dark Horse is comprised of two primary sections: the Motor Carrier Coverage Form and the Cargo Endorsement. (Ins. Policy (Dkt. No. 37–3) at Pg. ID#: 516, 523.) The Motor Carrier Coverage Form is the primary portion of the policy.[1] The Motor Carrier Coverage Form provides, in relevant part, insurance coverage for legal liability losses for injuries to third-parties caused by an accident with one of Dark Horse's covered automobiles (Ins. Policy, Section II.A, at Pg. ID#: 523) and physical damage and physical losses sustained by Dark Horse's covered automobiles (Ins. Policy, Section IV.A, at Pg. ID#: 529). The Cargo Endorsement is an addition to the Motor Carrier Coverage Form.

---

[1] The policy also indicates there is a "Truckers Coverage Form," but that form is not part of the record. (Ins. Policy at Pg. ID# 516.)

3

(Ins. Policy, Section VII, at PG ID#: 517.) The Cargo Endorsement provides insurance coverage for "'loss' to Cargo while in an Insured's custody or control in the ordinary course of transit." (*Id.*, Section VII.A.) The Cargo Endorsement defines cargo in relevant part as "[g]oods or merchandise for which an 'insured' is legally liable under tariff documents, bills of lading or shipping receipts, and while in or on a covered 'auto.'" (Ins. Policy, Section VII.A.I at Pg. ID#: 517.)

## III.    PROCEDURAL HISTORY

On November 5, 2015, Dark Horse filed suit against Lancer in state court, alleging common law breach of contract and bad faith refusal to pay loss pursuant to Tennessee Code Annotated § 56–7–105. (Dkt. No. 1–1.) Lancer removed the case to federal court on December 14, 2015. (Dkt. No. 1) Lancer filed a counter-claim on December 15, 2015, requesting a declaratory judgment concluding that: (1) Lancer is not required to indemnify Dark Horse for the undamaged Cargo; (2) Lancer is not required to indemnify Dark Horse because Dark Horse's legal liability has not been established; (3) coverage under the insurance policy is excluded based on the criminal acts of Dark Horse's employee; (4) Dark Horse has failed to fully cooperate with Lancer in its investigation into the cargo loss; and (5) Dark Horse has failed to satisfy conditions precedent for coverage under the insurance policy. (Dkt. No. 6 at Pg. ID#: 27–33.) Lancer filed its motion for summary judgment on Dark Horse's claims on December 16, 2016, arguing it is entitled to judgment as a matter of law because Dark Horse's legal liability to PFG for the cargo has never been established by a judgment at trial, which is a condition precedent for coverage under the policy. (Dkt. Nos. 1, 37.) Dark Horse moved for partial summary judgment on February 15, 2017, arguing we should dismiss Lancer's defenses to coverage under the insurance policy and in addition, find both that there was a direct, physical

loss to the cargo as required by the policy, and that Dark Horse's legal liability to PFG under the agreement was limited to $300,000. (Dkt. No. 46.)

## LEGAL STANDARD

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The moving party has the burden to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotation marks omitted). Once the moving party meets its burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513. Because the parties have filed cross-motions, we must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.3d 240, 248 (6th Cir. 1991)).

## ANALYSIS

### IV. BREACH OF CONTRACT

The parties agree that the Cargo Endorsement is the relevant section of the policy at issue. (Def.'s Mem. ISO Summ. J. (Dkt. No. 37–1) at 8; Pl.'s Mem. ISO Summ J. (Dkt. No. 47 at 3.) Lancer argues that it is entitled to judgment on Dark Horse's common law breach of contract claim because Dark Horse's legal liability for the alleged cargo loss has never been established by a judgment at trial, which is a condition precedent for coverage under Lancer's policy. (Def.'s Mem. at 8.) Dark Horse argues that it is legally liable for the cargo loss by the terms of its contract with PFG and under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706, and therefore Lancer is not entitled to judgment on its breach of contract claim. (Pl.'s Resp. (Dkt. No. 45) at 11–14.)

Under Tennessee law, "courts should construe insurance contracts in the same manner as any other contract." *Alcazar v. Hayes*, 982 S.W.2d 845, 848 (Tenn. 1998) (citations omitted). "Provisions subject to more than one reasonable interpretation are ambiguous, . . . and must be construed against the insurer." *Depositors Ins. Co. v. Estate of Ryan*, 637 Fed App'x 864, 869 (6th Cir. 2016) (citing *Hollis v. Doerfinger*, 137 S.W.3d 625, 629 (Tenn. Ct. App. 2003); *Setters v. Permanent Gen. Assurance Corp.*, 937 S.W.2d 950, 954 (Tenn. Ct. App. 1996)). "[I]n the absence of any ambiguity, 'it is the duty of the Court . . . to take the ordinary meaning of the words used, favoring neither party in their construction.'" *Setters*, 937 S.W.2d at 954 (quoting *Omaha Prop. & Cas. Ins. Co. v. Johnson*, 866 S.W.2d 539, 541 (Tenn. Ct. App. 1993)).

Lancer argues that the language of the Cargo Endorsement requires Dark Horse's legal liability be determined by a judgment. (Def.'s Reply (Dkt. No. 56) at 1–2.) By the terms of the Cargo Endorsement, Lancer will pay "all sums [Dark Horse] legally must pay as a motor carrier for 'loss' to Cargo." (Ins. Policy, Section VII at Pg. ID#: 517.) Dark Horse argues that it is

6

legally liable to PFG under the Carmack Amendment, which it contends "makes a motor carrier strictly liable for a loss to cargo and was enacted to facilitate the prompt payment of valid claims against shippers without the necessity of litigation." (Pl.'s Mem. at 4 (citing *Molloy v. Allied Van Lines, Inc.*, 267 F. Supp. 2d 1246, 1251 (M.D. Fla. 2003).)

Dark Horse's legal liability as an interstate motor carrier is governed by the Carmack Amendment, which "preempt[s] state and common law actions relating to the shipment of goods by interstate carriers." *Toledo Ticket Co. v. Roadway Exp., Inc.*, 133 F.3d 439, 441 (6th Cir. 1998). The Carmack Amendment "makes the carrier strictly liable 'for the actual loss or injury to the property' caused by the carrier." *Exel, Inc. v. S. Refrigerated Transp., Inc.*, 807 F.3d 140, 149–150 (6th Cir. 2015) (citing 49 U.S.C. § 14706(A)). Under the Carmack Amendment, "a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was caused by '(a) the act of God; (b) the public enemy; (c) the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods.'" *Plough, Inc. v. Mason and Dixon Lines*, 630 F.2d 468, 470 (6th Cir. 1980) (internal quotation marks omitted) (quoting *Miss. Pac. R. Co. v. Elmore and Stahl*, 377 U.S. 134, 137, 84 S. Ct. 1142, 1144 (1964)). "[U]nder federal law, in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages." *Elmore and Stahl*, 377 U.S. at 138, 84 S. Ct. at 1145 (citations omitted). After the shipper establishes a prima facie case, the motor carrier bears the burden of proof to show that "it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." *Id.* A presumption of negligence attaches after the shipper has established a prima facie case, but even then the carrier may rebut that presumption. *Plough, Inc.*, 630 F.2d at 470.

7

That the Carmack Amendment makes shippers strictly liable for actual loss to cargo does not entail that Dark Horse's legal liability to PFG has been established. "Legal liability means, with respect to insurance contracts, a liability which the courts of justice will enforce as between parties litigant . . . . It is fundamental that the legal liability of one person to another can be ascertained *only in an action brought against such person by the other in a court of competent jurisdiction*." *Witter v. Nesbit*, 878 S.W.2d 116, 119 (Tenn. Ct. App. 1993) (internal quotation marks omitted) (quoting *Glover v. Tenn. Farmers Mutual Ins. Co.*, 468 S.W.2d 727, 729–30 (Tenn. 1971)).; *see also* Steven Plitt et al., Couch on Ins. § 103:14 (3d ed. 2017) ("The term 'legal liability,' as used in a policy of insurance, means a liability such as a court of competent jurisdiction will recognize and enforce between parties litigant." (citations omitted)); *but cf. Travelers Prop. Cas. Co. of Am. v. Breeding Heavy Haulers, Inc.*, No. 7:09–124, 2012 WL 1029459, at *3–4 (E.D. Ky. Mar. 26, 2012) (holding that where an insurance policy expressly provided for the payment of adjusted claims and was not merely an indemnification policy, establishing an insured's "legal liability as a motor carrier" did not require a judgment against the insured). PFG brought no action against Dark Horse, and there has been no determination that Dark Horse is legally liable for the cargo loss.

Dark Horse contends it is a "forgone conclusion" that if PFG filed a lawsuit against it, "Dark Horse would lose the lawsuit and be held liable for the claim." (Pl.'s Resp. at 18.) Dark Horse argues that the undisputed facts show that PFG could establish its prima facie case under the Carmack Amendment, and that Dark Horse has no way to rebut the presumption of negligence which follows. (Pl.'s Mem. at 5–6). Lancer disputes that Dark Horse is liable to PFG, and indeed was willing to exercise its right and duty to defend Dark Horse, subject to a reservation of rights, in any lawsuit against PFG. ((Dkt. No. 37–15 at 2.) However, whether

Dark Horse would be held legally liable for the cargo loss is not the question before us. Rather, we must determine whether, by the terms of the insurance contract between them, Dark Horse was entitled to coverage such that Lancer has breached the insurance contract by failing to make a coverage determination. Because there has been no determination by a court of competent jurisdiction that Dark Horse legally must pay PFG for the alleged cargo loss, Dark Horse's legal liability has not been established for the purposes of the insurance policy and Dark Horse is therefore not entitled to coverage.

Dark Horse's argument that it is nonetheless legally obligated to pay for the cargo loss by the terms of the carrier transportation agreement with PFG is similarly unavailing. (Pl.'s Resp. at 12–14.) The agreement between Dark Horse and PFG imposes liability only to the same extent as the Carmack Amendment. (Dkt. No. 37–5 at 9.) Even if the agreement imposed a greater degree of liability, the insurance policy explicitly excludes liability assumed under any contract. (Ins. Policy, Section II.B.2 at Pg. ID#: 525 (stating the insurance policy does not apply to "[l]iability assumed under any contract or agreement," except for liability assumed in an "insured contract" or that "the 'insured' would have in the absence of any contract or agreement); *see also* Ins. Policy, Section VI.H at Pg. ID#: 533 (defining "insured contract").)

Dark Horse argues that exclusion does not apply as it is contained in the Motor Carrier Coverage Form but is absent from the Cargo Endorsement. (Def.'s Resp. at 8–9.) The Cargo Endorsement plainly states that the provisions of the Coverage Forms, which as explained above includes the Motor Carrier Coverage Form, apply unless modified by the Cargo Endorsement. (Ins. Policy at Pg. ID#: 516.) That is, exclusions provided by the Cargo Endorsement are in addition to, not in lieu of, the exclusions provided by the Motor Carrier Coverage Form, and therefore the Cargo Endorsement does not modify the exclusion for liability assumed by

contract. *See Nat'l Indem. Co. v. Ryerson*, No. C2–01–0223, 2002 WL 34461322, at *3 (S.D. Ohio May 7, 2002). Therefore, even if the agreement between Dark Horse and PFG imposes liability beyond the Carmack Amendment, Lancer is not obligated to provide coverage for such liability because the exclusion for liability assumed by contract is not modified by the Cargo Endorsement and applies in full force. Accordingly, we find that Lancer did not breach the insurance policy by failing to provide coverage for Dark Horse's cargo claim, because Dark Horse's legal liability for the cargo loss has never been determined by a court of competent jurisdiction.[2]

## V. BAD FAITH REFUSAL TO PAY

Lancer also moves for summary judgment on Dark Horse's claim that Lancer refused to pay its insurance claim in bad faith in violation of Tennessee Code Annotated § 56–7–105. (Def.'s Mem. at 22–24.) Under Tennessee's bad faith statute, a plaintiff must establish:

> (1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been made, (3) the insured must have waited 60 days after making his demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days), and (4) the refusal to pay must not have been in good faith.

*Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986). As explained above, Lancer was not obligated to pay Dark Horse's claim because Dark Horse's legal liability has not been established. That is, Dark Horse's insurance coverage has not, as a matter of law, become "due and payable." *Hollahan v. Standard Fire Ins. Co.*, No. 3:14 C 00001, 2016 WL 8716658, at *18 (M.D. Tenn. July 1, 2016) (citing

---

[2] In addition to asking us to dismiss Lancer's defenses to its breach of contract claim, Dark Horse moves for summary judgment on the issue of the total amount of coverage under the insurance policy for its liability. (Pl.'s Mem. at 8–10.) Because we find that Lancer was not obligated to pay Dark Horse's cargo loss claim, that argument is moot and we deny Dark Horse's motion for partial summary judgment.

*Thompson v. Fid. Mut. Life Ins. Co.*, 92 S.W. 1098, 1104 (Tenn. 1906) ("Inasmuch as complainant . . . is not entitled to recover the insurance, it follows, as a matter of course, she cannot recover any penalty for withholding it.")). We therefore grant Lancer judgment on Dark Horse's bad faith refusal to pay claim.

## CONCLUSION

For the foregoing reasons, we grant Lancer's motion for summary judgment and deny Dark Horse's motion for partial summary judgment. We further deny Lancer's motion for oral argument on its motion for summary judgment.

The status hearing previously scheduled for October 17, 2017 is hereby vacated and reset for March 27, 2018 at 12:00 p.m. The pretrial deadlines, as set forth in our July 10, 2017 Order, are hereby reinstated as to Lancer's remaining counterclaim. In addition, the parties shall meet to discuss settlement on or before October 30, 2017. The parties shall file a joint status report indicating the results of that meeting on or before November 6, 2017. It is so ordered.

*/s/ Marvin E. Aspen*

Marvin E. Aspen
United States District Judge

Dated: September 11, 2017
Nashville, Tennessee

11